May it please the Court, I'm here today to discuss with you the lower court, the MSPB and the agency deciding official that did not analyze 11 comparators under the disparate penalty analysis. This is Douglas Factor 6, the consistency of the penalty imposed on other members within that department of similar offenses. Without this analysis, we argue that the removal of Gomez-Rodriguez exceeds the bounds of reasonableness and no nexus can be found. When the incident occurred where a letter was written to the base general on April 19th by then officer Cobb alleging wrongdoings in hiring and also hiring an officer that was under investigation for theft at another base. The investigation started on a whistleblower complaint but then brought in Gomez-Rodriguez as he was accused of one alert system which is a law enforcement database to find out this particular officer's... Well, I appreciate your reputation but I think we're all familiar with the facts. Yes. Where's the shortcoming here? Those allegations with regard to conduct unbecoming and the other matters were largely based on credibility determination by the administrative judge. Yes. So what's the basis for reversing those determinations? Well, on reversing the credibility determinations, it is absence of the facts of the records. The administrative judge stated that Gomez-Rodriguez would say just about anything to save his job. However, the record reflects that the reasoning is incorrect because number one, it states that he did not make any DUI arrest that week when he was in DUI training class. However, that logic fails because police officers do continual training and what occurred is that if that logic continues, then if he was in training for domestic violence, he would have to make a domestic violence arrest that week. Also, Officer Pareto confirmed that, in fact, Gomez-Rodriguez was in the class and that he, in fact, gave him those instructions to search the name by no uncertain means. So there is no divergent testimony as to between what Officer Pareto says and Officer Gomez-Rodriguez. And then as to the nature of the search, Deputy Chief Russ testifies on what is a name check search and also what he considers unauthorized search, not pointing to any type of policy, just what he believes it should be the policy. So that type of credibility determination is absence of the facts that are actually in the record and actually it shows the comparators that are doing name check search, 11 of those, and then as far as the type of punishment that they're actually received within that division. And that the supervisors were not, you know, first line supervisors, but they were division chiefs. So this effectively set the policy for the division. The deputy director of DES is over all police officers and guards. The deputy garrison commander is over DES. So when they made the determination to remove, it is not a patchwork of supervisory change to compare what happened. What happens is, is he set the policy, this is what should be the punishment for someone who does a name check search. So the credibility determination that he would say anything is not backed by the record, simply because the record reflects everything that officer Gomez said is backed by a document. And the diverging testimony is not really diverging, it's just they're testifying because there is no standard operating procedure within the unit for the alert system. So you have officers doing one type of search, officers doing another type of search. This should be the policy, but what you have is an organization and agency that has no clear policy on what individual officers should do, the type of search to look up a type of case, and what is authorized use. The Army's brief goes through at ages 22 and 23 what the audit was of these 11 others who may be misused, or I think the Army found didn't really misuse the alert system and had citations to evidence in the record. Can we rely on that as responsive to your Douglas argument and due process argument that your client was treated somehow discreetly? I'm sorry, your honor, I didn't answer the first part of your question. The first part is I was referring you to the red brief where the Army addresses at pages 22 and 23 these 11 other possible comparators and their use of the alert system, and it points us to places in the record that show what that audit revealed and why at least the Army thinks that nobody was treated dissimilarly to your client. And my question is, can we rely on that? No, because what it is is that in looking at the type of search, and this is in their allegation into why he is dissimilar, is that they raise an unconstitutional provision of due process. They're saying that, well, he gave the information to another officer, therefore he's dissimilar than the other officers that were punished. However, that is not in the specification in the charge. And so what Officer Gomez was prepared to defend is what is authorized use and official purpose? And when we addressed that, there was no policy for official use and official purpose. Those 11 comparators, particularly Officer Roden and Officer Pelequin, they did very similar things to what Gomez-Rodriguez did. However, what the drawing line is is that they kind of veer off into the allegation of he gave it to someone else, but that was not the charge. And so we're looking at the narrow charge of what was the authorized use and official purpose. For that purpose, the 11 fit within the category of name check searches and then the type of punishment that was given to each of those 11. So you're saying the authorized, the charge that was made didn't extend to him sharing the information he learned? No, it did not. What about page 24 of the red brief? You've been arguing that there are insufficient procedures, but this outlines the provost general AR law enforcement reporting, and that explicitly calls out unauthorized use, which includes request, dissemination, sharing. Yes, and that is true. However, that is a general policy banner. In our reply brief, we replied as far as to the second 15-6 investigation, what the investigator found is that each individual base is supposed to tailor their specific policy as to how the system is to be used, what type of trainings and things of that nature. However, there is no definitive proof that cited in our reply brief that is now a final order now. The judge in Officer Cobb's case found no proof that Officer Cobb received information from Gomez Rodriguez. Did the judge here, did the administrative judge here make a specific finding on that? No, they did not. Actually, to address that point, we weren't allowed, because the narrow issue was official use and official purpose. We were not allowed to address the point, and we had witnesses lined up to testify to show that nothing passed between Gomez Rodriguez and to Officer Cobb. So it's an allegation that's made, but was not allowed to be explored during the hearing, so we can disprove it as we did in the Officer Cobb case, in which the judge at Independent Fact found that he got the information from a separate individual through a Facebook chat, not through Officer Gomez. You have not challenged the evidentiary ruling, though? You have not challenged on appeal the evidentiary ruling about what witnesses you were allowed to call, have you? That's not part of your appeal? Part, some of them, yes, but not directly, to answer your question. Only on certain witnesses, like with Officer Cobb and on this particular issue here. But where is that put at issue in your appeal? It's not specifically stated yet. It's just stated in the fact that we were denied that particular witness to testify. And to emphasize that point, with Officer Dietrich and testifying on the credibility determinations, he was in a class with Officer Gomez Rodriguez. He were denied that witness. That's how the challenge came about to that particular thing. What about the government's assertion that on every single alert screen that Mr. Gomez Rodriguez encountered, it would warn him in capital alert, then say it's for official purposes only. So that, you say that it didn't have a policy on the particular base he was on, but if the program itself says it on the program when you encounter the program, isn't that enough information for him to know it can only be used for official purposes? Yes, and he did. He was in, and part of the factual background is, is that he was in a DUI class. His, the instructor in the class said, look up my name to write narrative reports so you know how to write them. And later, that type of explanation and training using alerts was determined as official use and purposes, and that was Officer Rodin's case. So yes, the banner is there, but also within that banner is permissive language that at the very end of it, it states that violation of this may be, you may be subject to administrative punishment or legal proceedings. And so the permissive use of may shows that there's discretion as to whoever is supervising this has a discretion to say, okay, if you violate certain parts of this, we'll determine what will happen, but at the same time, there is no mandatory language that it is an absolute punishment. So the policy that banner does not say, you can't do a name check search, which might rely and turn up other information. Well, but your use of may sort of slides in the face of my own sort of parenting, right? Like if I say to my kids, you may get in big trouble. I mean, I feel like they're going to know they're going to get in big trouble if they have that, or at least it's on the table. So what's the, you know, he got an alert that you may be in trouble, and he got in trouble. How does that help you? But in this case, using your analogy as a parent is that if the child did everything that you asked to do right then, and you instructed them to do, then you cannot come back behind him and say, well, you told me that do this name check, do this search. You didn't tell me my exact instructions on how to do it because I wasn't trained in that manner. But now I'm being punished because you decided that I found something that I didn't, wasn't supposed to find, but I did exactly what you instructed me to do. Wasn't this all adjudicated below? I mean, this was, wasn't this all adjudicated below? We started a few minutes ago talking about credibility determination. Maybe I'm wrong, but it's my recollection there was a Colonel Ross or someone, I mean, there was testimony that the AJ credited about whether or not this was an authorized use or not. And your client what testimony was in conflict with someone else's, and the judge credited the other person, right? Am I correctly stating at least what happened? You're correct in that. And my response to that is that the record does not support the judge's because there simply was no policy in place until after the removal in May. So you're saying there was no, there was no standard against which anyone could adjudicate or judge whether or not this use was authorized or unauthorized? Exactly. That policy did not come into play until the second AR-15-6 in May of May. You're saying there's no policy and so that anybody can go in and search for any purpose they want and they can't prosecute or the agency can't take any action as a result of that because of the absence of a policy? No, I would not go that far. What I am saying is that the parameters on the factual situation that Officer Gomez Rodriguez was searching, a name check search asked to do by his supervisor, his field training officer, there was no policy guiding and directing him to say you cannot do a name check search that will allow you to get general information. There was no policy on that. So Officer Gomez Rodriguez's intent was to look up DUI cases to find, to write better for this field training officer. So he wasn't off wild running and searching for everything. He had specific instructions which he happenstancely came by the larceny case that came up under that training officer's name. So that's where, yes, the credibility determination said this, but however, the record reflects that there's no policy. So you say Officer Pareca instructed him to do a search for Pareca's own cases, right? Yes. But what about, I mean, the record also reflects that he also searched Burgess's name. Was he, with his argument that he was instructed to search that as well? Yes, because that's also, he was looking for the same type of narratives. And it is in that testimony that oftentimes officers to best write for them, and Pareca testifies this, is that they will look up old cases and say if you want to write a narrative for me, and there's several field training officers, and officers might switch on different shifts, is that, okay, this is how you write for Officer Pareca. This is how you write for each officer's particular, field training officer's particular, how they receive their reports. That's why they direct you to look up their own cases so that you write perfectly for them when you finish their search. And so what, is what went down here that, I mean, the problem here is he just searched by name. He didn't search any discreet things that his teacher was telling him to search. Yeah. And you're saying that in the absence of a policy telling somebody precisely when you're going to search DUI for Gentleman X, you should search DUI for Gentleman X as opposed to just doing a global search about that person. Exactly. And in that, and more clarity is, is that there is officer search cases different ways. And when you do a name check search, just the, it comes up and you have to click on it, and then you see what the case is. And so, along with much other information that you had no business looking at, right? Well, you don't know until you click on it. Yes. So in that sense, that's why the name check searches in the 11 comparators did the exact same thing. And we're on, and that's where the comparators come in as far as the type of reasonableness of what should happen to go administer our readings. So yes, they answer your question. Okay. Well, it's, um, you're way over time. Let's hear from the government. May I please the court? The issue before the court today is whether the MSPB aired when it based on two charges. First, conduct on becoming a law enforcement officer, and two, failure to maintain the condition of employment. Let's turn to the comparators. Yeah. Is it correct that there were 10, 11, I forget the number of comparators who had done searches precisely the way Mr. Gomez had done them, but no action was taken against him? One, is that correct? And two, if that's so, or close to being so, what's the answer to that? No, Your Honor, that's not accurate. With respect to the comparators that my friend refers to, those comparators came from a subsequent AR 15-6 audit, which was in May of 2021, and Mr. Gomez Rodriguez was groomed in February 2021. So these, the subsequent analysis of these after the initial, or almost a year after the initial investigation, and a month after Mr. Gomez Rodriguez was removed. And as to... The report was after. The report, right, was after. The report states that it was initiated in May 2021, and concluded in June 2021. I don't understand. Are you saying that as a matter of law, comparators only can involve conduct that occurred before the conducted issue and not after? Is that the point? I don't understand the point you're making. Only to the extent that the deciding official could not have used those comparators if they were identified subsequent to the decision for removal. But I want to turn to... Was this the final decision? That happened subsequent to the final decision removal? Correct. There's... Does that seem right to you, though? I mean, if there were right on comparators, if 10 people did precisely the same thing, and two months after they fired me for doing that, nothing happened to any of those people, can I get that evidence in somewhere, even if it's, you know, before an AJ? Well, Your Honor, I wanted to also turn to that point, which is that there are no direct comparators to Mr. Gomez-Rodriguez that were identified in the subsequent investigation. And, in fact, some of those officers were disciplined. I don't have evidence in the record as to what ultimately resulted from those separate cases. Well, did somebody make a finding that those comparators were not relevant comparators? Yes, Your Honor. The testimony before the Board from the deciding official was that Mr. Gomez-Rodriguez's conduct was assessed and was the focus, and that his conduct was sufficient for his removal. But did he also analyze that the comparators were not relevant comparators in the case of St. Pete's Redrawal? The record then, the testimony before the Board, does not get into that specific granular detail. Again, these comparators, at least some of those that were referenced, were identified subsequently. So how do you know they were different? Is it part of the record, the differences? Correct. The investigation is ultimately, the report is in the record. So it was in the record before the administrative judge. So we, in the brief, we tried to address these comparators and address the different arguments on this front and show that they were not comparators. So that analysis was really struggling to follow your argument. Is your argument that these comparators, as a matter of law, cannot be considered either at our level or by the lower tribunal? Or is your argument these comparators were in fact considered? Which is your argument? The comparators were not considered. And I can point to the record where the deciding official states that the information presented for his decision did not address these other comparators. And this was testimony in a hearing before the Board. And your answer? If you have a record site for where you're saying the Board said we're not considering the comparators, where is that? Mr. Hardin is the deciding official and his testimony is at Appendix 465. I'm sorry, are you saying the Board did not consider the comparators or the deciding official did not consider the comparators or both? Both. Both that these comparators were not presented. They didn't exist at the time in the packet presented to the deciding official. And they did not factor in the administrative judge's decision in the main. The administrative judge did consider comparators with respect to discrimination claims. I don't understand. So I'm looking at page 465 as you told me to. It's in microscripts. There's a bunch of pages. Show me exactly what you want me to look at on page 465. Excuse me, Your Honor. At Appendix 469, there's a lengthy discussion of comparators that begins. It's the nature of live testimony. So it cuts in and out. What page? 469, but there's four pages in 469. Which one? On page 193, and then as I understand it, counsel asked Mr. Hardin, how would that affect your analysis not having a picture of those looked at, Officer, correct his name in there by doing that. And he said, sorry, that would not have changed my analysis as to whether or not to search for alerts. Okay. So first off, what we see on page 193 is, if I'm not mistaken, it's Mr. Caldwell saying that he did not have any other, he did not have any information about comparators when he made his decision. Is that correct? That's correct. Okay. So he made a removal decision. He didn't have comparators. I don't think that that's probably super unusual that the removing official may not know everything that's gone on across the Army. This is the Army, right? Like one person probably doesn't know everything. But then as the case moves through the process, and it moves up to the ALJ or the board, and the defendant becomes, or petition, whatever it's called in this case, becomes aware of all these comparators and introduces that evidence, isn't there an obligation under the Douglas factors to then take that into account, even if they hadn't been presented to the removing official? Yes, Your Honor. And I don't think that happened here. The administrative judge does address other comparators, and the briefs aren't totally clear on exactly which comparators we're referring to. The testimony and the board addressed comparators in the context of a discrimination claim, which is not present before the court. But in that adjudication of the discrimination claim, the board did address the idea that there were disparate treatment across these comparators, and the board found that that was not available. So the board did consider the penalty amongst comparators and found that the agency had supported the charges by preponderance of evidence, that Mr. Gomez Rodriguez did conduct unauthorized searches with an alert, and that he had been decertified from the IRP program for his misconduct. So the board did consider it eventually, and in your briefing to us, you cite evidence in the record that you think shows that essentially there really are no comparators, right? Correct. Right. The board's decision does not enumerate every piece of evidence that the board considered, so the testimony before the board and the board's self-reference this kind of evidence. It does? It references comparators? Yes. There it is. So this is at appendix 23. And there's a discussion of other officers who have been involved in the DCIF's investigation. And wait, I'm sorry. I'm on page 23. Where is the discussion of, you know, Floyd DeCampo stood up and he said there were 11 comparators alleged in this case, 11. He actually used a number and said these were not, these were overlooked by the deciding tribunal below. You've agreed that if comparators are presented, they must be part of the doublet factor analysis. So where did that occur? As I understand counsel's argument is that the comparators that were presented or identified, as he uses the term comparators, those comparators were identified subsequent to the removal decision and the doublet factors that were enumerated in that decision did not impress those comparators. Okay, but wait. So the comparators arose after the removal decision, but remember we had this dialogue and Judge Post had a dialogue with you and she asked, wait a minute, two months after I get fired, it turns out there are 11 other people who were treated differently than me. Shouldn't I have an opportunity to introduce that evidence and have it be considered? You said yes. And then in response to my question, you likewise said yes, if it's introduced, the board has to address it. So I don't think, at least for me right now, you're saying that because they arose after the removal doesn't seem to obviate the legal necessity of having those addressed. Two points, Your Honor. First is that the quote unquote comparators were not true comparators and that they did not have the same misconduct that Mr. Gomez Rodriguez was talking about. And how do we know that? And who adjudicated that? I mean, did somebody, the AJ in contrast, I mean, I'm not seeing it on page 23 in terms of the assessment of this. It's not in the administrative judge's decision. It is as it arose in the subsequent AR-15-6 investigation. So if you review the charges in that investigation, some of the personnel conducted searches, one officer conducted searches at Mr. Gomez Rodriguez's instruction, which is the closest basis for comparison. Okay. I'm still not understanding the first part of my question, which is where in the record is this? And where in the record is an analysis or you're telling us that they were all different and this was the closest. That's fine. But did somebody else say that? Like the administrative judge? It is not in the administrative judge's decision, the analysis of... But were the arguments made to him? Did he have the evidence? It's not clear to me when this came up. I mean, presumably Mr. Gomez's attorney raised this or I don't know, maybe he's saying that it was upon you to do it as an affirmative thing because of the Douglas factors. But where is it? The AJ had this stuff before, I'm sure. I'm not aware of the AJ's review of the 15-6 investigation that was subsequent to the removal decision. Can I ask you just a legal question, which I really don't, not sure what the answer is. It's the deciding official who makes the decision who's required to consider the Douglas factors. So if the deciding official doesn't consider the Douglas factors, under our law, if the AJ asks them, did you consider this? And he says no. But then the AJ herself analyzes that they wouldn't have been relevant. Is that sufficient? I mean, don't we need for the record the deciding official's consideration of these matters if they're, to the extent they're necessarily relevant? You may have an argument with respect to timing. You may have an argument with respect to his not putting forth these arguments. You may have other arguments about that. But am I right or wrong on the law that we need to have the deciding official consider it? And Your Honor, to that point, the deciding official did consider the Douglas factors, there was a third Douglas factor. No, we're just talking about the correct, the comparatives, right? And he didn't consider the comparatives. And your first answer was that they happened afterwards. Well, is that? As I understand the timeline, Your Honor, that's correct. Okay. So is it your view that because they were considered afterwards, he doesn't have to? Maybe you're, I mean, I'm not deciding whether it's a result here. I'm just wondering what your position is on that. I don't want to get too far afield of what the deciding official actually considered in the removal decision and the basis for the removal decision. The administrative judge made credibility findings. I'm sorry, I'm looking at page 469 of the appendix, page 195. And Mr. Caldwell asks, I think the deciding official, did you have any comparatives to look at under the Douglas factors to compare the penalties? And the answer is no, sir. And then the question is, would it change your opinion if you had other officers who had done the same thing under the analysis of, and then there's an objection, and then there's a question. So it looks like he didn't consider the comparatives, right? His answer is that Mr. Gomez Rodriguez's conduct was of such severity that he would have been removed for that. And there I see you're saying it. He says, if you're asking me a theoretical question, had other officers similar acts, then yes, I believe that would have required consideration under those factors of penalty of disparate treatment. So he didn't say it wouldn't have mattered. You know the record better than I. Did he say it wouldn't have mattered? He says in response to how would that affect your analysis, and he says, sir, that would not have, this is at the bottom of 183, sir, that would not have changed my analysis of whether or not officer Gomez searched and alerts. And if we. But that's saying it wouldn't have changed his analysis of whether he conducted a search. It's not saying it wouldn't have changed his analysis of what the penalties should be. That's exactly what these go to, right? Comparatives go to penalties. Yes, ma'am. You referenced the AR15-6 later investigation. Is that in our record? It begins at page 74 of the appendix. 74? 74, correct. And in your brief, when you try to distinguish the 11 comparators, it's at page 22, 23 of your brief, you cite to pages 529 to 534 of the appendix. I'm going to have the wrong version of the appendix in front of me. Just like an index in my version. What is it that you're citing at 529 to 534? It may have been a holdover site from when the appendix was changed, but the reference was to the 15-6 memorandum. So the same thing that we just talked about? Correct. So the same memo that's now at page 74? Yeah, the memo begins at 74 and continues on with the first page of the May 12, 2021 appointment at 86. Can I ask you kind of a sort of legal question, but a process question? You represented that all of this stuff happened after the deciding official made his decision. All of these comparatives? The comparatives that Petitioner referenced in his brief were identified in an additional audit of the alert system. There were several officers in the same audit that had identified Mr. Gomez-Rodriguez's misuse of the alert system, and those officers were disciplined, or at least several of those officers were disciplined for their misuse of the alert system. Okay. Well, you're just throwing a new thing into the rig. I mean, okay, so I've got just a couple of questions, the obvious ones about the facts. So how many comparatives were there? Did their conduct, the action, it's not when their conduct occurred, it's when the agency discovered their conduct and what, if any, action they took against them. When did that all go down? Did any of that go down before the deciding official made his decision? Did he have any comparatives alive to look at when he made his decision? Was that in play? I want to stay away from the use of comparatives because the misconduct identified in the audit did not have a one-to-one correspondence with another officer. This was Officer Cobb, and he was disciplined, but for different reasons. Okay. All right, so maybe they're not comparatives. I mean, maybe we've just been assuming there were all these comparatives there, and your real argument should be that there weren't any comparatives to be had. That's correct, sir. Well, so the question is, when did this all go down? Like, did the deciding official, did Mr. Gomez say, you've got to look at comparatives for the double factors, and I don't know who has the burden to come forward with what those comparatives are, but did any of that happen before the deciding official made his decision? The initial or the notice of proposed removal was in October of 2020, and the removal decision was in February of 2021. That's Mr. Gomez? Correct. Okay. And the union did submit information on October 28th of 2020, I believe, in response to the proposed removal decision. So the union, while the proceeding was before the proposed official or the deciding official, information was put into the record by the other side that these are comparatives, and you should consider them. I don't believe the argument is that clear in the union's submission, but the union did respond with respect to several officers who were involved in the similar misconduct. Okay, and the deciding, that was before the deciding official rule. How come he says in his testimony that he didn't have any comparatives? Is that because he concluded they weren't comparable, or is that because he didn't really look at that? There's nothing directly in the record that explicitly lays out the deciding official's train of thought, but that appears to be the case, is that there were not direct comparatives for Mr. Gomez-Rodriguez's misconduct. Okay, so Mr. Gomez-Rodriguez's misconduct is that he used the alert system first to search for Officer Pareca. Is that correct? That's correct. But wasn't he, is there any dispute that he was actually instructed by Officer Pareca as part of the report? Your Honor, this is a factual question that's a little bit of an argument that's not really being placed for two ships passing in the night. The agency audit found that Mr. Gomez-Rodriguez searched for Officer Pareca within the database system, but the way the keystrokes that he used, the way he conducted the search was not to find a report that Officer Pareca had authored, and therefore he could model or see how to write the report, but that Mr. Gomez-Rodriguez's search for Officer Pareca as a subject then identified a case that was, the subject was larceny, even though the training was on DUI, and then clicked on that three different times. So that was the agency's finding. Now, the administrative judge made a determination between whether it was more credible with the agency's view of the facts, as I just laid them out, or Mr. Gomez-Rodriguez's explanation of the facts, which was that his use was authorized because he was told by Officer Pareca to conduct these searches. And did the competing witness that the judge credited, Mr. Ross or somebody like that, did he, he said, that this is not authorized use? Did he say that no one should have or would have thought that this is the way you should do the search that is appropriate by just typing in the guy's name? That's right. That's what Deputy Chief Ross testified to. And your friend here, just to switch gears, says, well, that's all nice that you say that, but there was nothing in writing, there was no guidance given as to how we should do this. So there's nothing in writing that says what maybe the witness said, which is anybody should have and would have and could have known that an authorized use would not consist of just globally typing in the guy's name. Your Honor, it's true that there were no, at the time, standard operating procedures. That term is defined, which were developed subsequently. But there's no question that Mr. Gomez Rodriguez's searches were not authorized or for an official purpose, as those terms are understood. As your Honor pointed out, the guidelines from the Office of the Provost Marshal explicitly call out unauthorized use, which includes... Yes, but all of that goes to the question that I was asking you, is how do we know that use was unauthorized if he was expressly told to search for reports created by Officer Pareca, and if he didn't know how to do that except to put in Officer Pareca's name? So it's not a question of... There's no doubt if everybody believes that he is trying to find dirt on Officer Pareca, that's a problem. But according to Gomez Rodriguez, he was doing exactly the search he was instructed to do in the only way he was instructed to do it. And that was the question before the Administrative Judge, and the Administrative Judge weighed in the testimony before the Board the credibility of the witnesses. Deputy Chief Ruff said that the way that those searches were conducted were not consistent with what... That the audit results, the keystrokes that Mr. Gomez Rodriguez used, were not consistent with his explanation of authorized use. Well, okay, but that's because Mr. Ruff knows how to do the search to pull reports that Officer Pareca himself wrote, as opposed to reports about Officer Pareca. Deputy Chief Ruff also testified that anyone using the alert system would have known how to do that. Or an ordinarily skilled person on the alert system would know. I mean, what we have to get at, or what the ALJ has to get at, is did Gomez Rodriguez conduct the search he was instructed to conduct in a way that was reasonable, or did he clearly go outside that? I'll refer to what the Administrative Judge found to be relevant on this point. First, that Mr. Gomez Rodriguez accessed a case and clicked on a title that included the term of larceny, and so it was unrelated to the DUI case that Mr. Gomez Rodriguez said that he was searching for. So that is inconsistent with Gomez Rodriguez's explanation of his supposedly authorized use. Mr. Gomez Rodriguez did that three times, which indicates that if you make a mistake, maybe it was a mistake to click on the larceny case once, but Mr. Gomez Rodriguez accessed that case several times. And the Administrative Judge also found that Mr. Gomez Rodriguez had not passed the DUI course for the training that Officer Pareca had instructed and was not authorized to do these kinds of spots. Can I ask you about, we started off with your friend and he talked about the fact that he was also charged, or there's some problem with him also disclosing that disclosing, but I think he said that he wasn't charged with improper disclosure, he was just charged with improper access. I just want to clarify that. Right, and the specification does not reference the disclosure. The specification that was included for Charge 1 in both the Notice of Proposed Removal and the Decision on Removal state. Between on or about 1st of March 2020 and 20 March 2020, you improperly searched for Officer Michael Pareca and Officer Corey Burgess in the Army Law Enforcement Reporting. Well, you don't have to read the whole thing. Did it charge him with disclosure of that information or just with improper access? No, it charged him with improper access and that is what he was removed. Okay, I don't know if the Chief will indulge me with one more question, which is completely different than anything else. I think it's a legal question. We have some cases which are mixed, not discrimination, but where somebody loses their confidentiality rating or their secret access clearance and then they get fired because they can't do their job. And we have different, I think different reviewability questions arise as to what we can get involved with and what we can't. This seems to present something maybe comparable and that's my question. He got dismissed or whatever for this, he was decertified from the IRP, which is called an IRP, and then he was removed in part because he was decertified from this program so he can't do his job. Is there any limit or difference in the extent to which we can review that determination, i.e. his decertification? Are we constrained in any way, shape, or form? We are not aware of any court precedent addressing the IRP certification. The administrative judge did look into the whether the agency's basis for its decertification was supported by the preponderance of evidence, and they cite board decisions, like me in this case, to one where an employee had certifications to deal with hazardous chemicals. And so the board did look into the preponderance of evidence, so this is not... So no issue argument was made that we are constrained to look at that. Like, you can't get certified for firearms, we're not going to put somebody out with a firearm and they said he couldn't do it. Correct. Though I want to point to one piece that underlies all of this, which is that charge one is the primary driver for Mr. Gomez-Rodriguez's removal. Hardin, the deciding official's testimony at 465 was asked, what did you determine to be the appropriate penalty for charge one? And Mr. Hardin responded, I sustained charge one and I decided that removal was the appropriate penalty. And then following up on that at appendix 471, the administrative judge asked Mr. Hardin, if you had not sustained the first charge, how would your decision have been to the second charge, which is the certification? And Mr. Hardin responded, had I not concluded that he accessed alerts, in other words, I concluded that he did not do that, I would have decided the second charge would probably not be applicable because it was based on his access in the alert system. So the court need not consider the decertification in charge two if there is a concern about looking to what factual basis the agency had because the agency's deciding official testified that charge one was the driver and that Mr. Gomez-Rodriguez would have been removed on the basis of charge one alone and further supported in the decision to propose removal. All right, Mr. Paltrow, you can have as much riddle time as you want. No, that's only if we ask questions. Thank you. Can you give me a piece of the court? To the issue of when what we call the 11 comparators were actually provided, they were actually provided on November 16, 2020. And that's provided to Deputy Chief Russ and to Deputy Garrison, not Deputy Garrison Commander, but Assistant Director of DES Lowe. And provided exemption with this proposed removal hanging out there as a response to that, not just randomly provided. Well, actually, and I'll get to that point. We actually had to come close to filing a motion to compel. These 11 comparators were provided us the day after the pre-hearing submission date as the agency's third response to our discovery. And the union actually made a information request for these comparators because this is mentioned at the bottom of the Frost investigation, where his recommendation to the base commander was to do a three-year audit on all persons who access. I'm sorry. I don't want to cut you off, but I only need to know the level of detail I need to know. Okay. So, the union provides this. This is between the proposal, this is the union's official response to the proposed removal decision? Actually, the union did not get the information until the hearing. Which hearing? Before the agency or before the AJ? Before the AJ. It never was before the deciding official, Mr. Hardy. Okay. Because the union had requested it before the deciding official made his decision, but it had not been provided, so they couldn't provide it in response to the proposed removal? Yes. However, Deputy Chief Russ had it since he actually did it November 16, 2020. Let me see if I can clarify, because I think I understand what happened here. The Army actually decided to undertake at its own initiative an audit to see how many other people potentially, like Mr. Gomez Rodriguez, are accessing the alert system and under what circumstances. The Army prepared a report on November 16, 2020. Following that review, they provided it to Deputy Chief Russ, among other people that demonstrated, oh, look here, we have 11 people who also appear to ultimately have access to the alert system in a manner that may be troubling. Yes. And so the Army was in possession of that information at the time that one of its decision makers was rendering the removal decision in this case. Exactly, yes. But on the timing, though, they wouldn't have, to the extent they were going to take any action, and maybe they did in some comparators aren't they did the same thing. It raises the question of, and what did the agency do to them in response to their doing it? So that would have happened later, right? We would not have known if they would have taken action then or later. Okay. So what happens in this kind of case? It seems like, okay, the information isn't available to anyone in terms of the decision as to what action to take until later. So did you go to the AEJ and say, we've got this information, we think it's relevant. Did you need to have it put into evidence? Was it put into evidence? Yes, it was put into evidence. And the way it occurred was they actually did have the information. We had to file a motion to compel and withdraw that. And then after it was withdrawn, we got it the next morning after pre-hearing submission. However, the AEJ allowed us to submit it a day late after the pre-hearing submission, given the nature of it. Okay. And then, so you've got the deciding official on the stand who saw some of that testimony. What did you do with that information? What was done with that information during the hearing, even though it's kind of late because the deciding official obviously didn't consider it when he made the decision because he didn't have it? Well, my line of questioning went to the deciding official as to what would he have done as to the nature of the discipline and how would it have changed his analysis to remove Gomez-Rodriguez? And did you have information at that time that people who you argued had committed comparable conduct were disciplined in a less severe manner? Yes, I did. So that was all tied up and it was above. Yes. And you presented it to the deciding, I assume you also argued to the AEJ. Yes. And so where in the opinion does the AEJ deal with this? And that is our contention. The AEJ makes no reference to this report, makes no reference to any other comparatives. The ones that the EEOC portion of the claim, but not for the administrative portion. So she went down and went, who was of what race, what was their age? Oh, so it was before that he did deal with it. I mean, there's a page in the record. Page 823 is referenced. If you put it in for discrimination, they dealt with it in that context. Well, no, they dealt with the IRP certification, not the discipline. So that was a different issue. Our issue was, is that the IRP decertifications were just made on a discriminatory basis, not the actual removal process as comparatives to his removal. But did you, but you just told us you put in the information when you got the information and you put it in, but you put it in connection with the discrimination case, right? Yes. I believe I understand your question. Yes. So it goes into the discrimination case and the judge rejects it. Yes. So why isn't that sufficient? Well, because those are comparatives for the IRP decertification, not to the reasonableness of the penalty of the removal. Those same comparatives, those are different parties as far as to an employment action, as far as to a promotional opportunity that Gomez Rodriguez lost. And he was making an allegation that he was decertified to help another candidate that was six that went first. Did you argue to the ALJ or the board that there are 11 comparators on the charge, not just on the discrimination portion, but with regard to the charges that need to be considered in the context of the penalty? Yes, we did. So you said you introduced these comparators for two different purposes. Purpose number one is related to discrimination. And the ALJ expressly addressed them in that context and said, these aren't comparators because these other people don't have the same race or whatever. Yes. Then you also introduced them for purposes of saying and arguing that Mr. Gomez Rodriguez's penalty of removal was too severe in light of how they treated other people. Exactly. And let me clarify. Do we see that in the record? Yeah, let me clarify first. Now that I understand the context of the question. To the discrimination purposes, we did not introduce these 11 as part of that for the discrimination purposes. The 11 were solely introduced as far as to the purposes of the comparative discipline as far as to what they did. The discrimination portion of it, those were names that we had from a selection list that were separate from this November 16th, 2020 report. So they came from- Totally different comparators. Totally different comparators. So the ALJ considered comparators, different individuals actually, different people. And those comparators for the discrimination claim, the ALJ never considered this report and the people articulated in it for the penalty. Exactly, yes. And if we look at the record, and maybe you can somehow give a sense, although we don't have the complete record here, where you put in that evidence and whether there's any discussion or whatever. And I assume, was there briefing before the hearing and before the ALJ? Was there briefing done by the party? No, there was no briefing done by the parties. Was there an argument made before the ALJ? We did do an argument and what we did find, and where you find it, where it was put in the record, is under Officer Gomez Rodriguez's testimony. Okay, but your position before us is that the evidence was admitted and you made an argument to the ALJ, either through witnesses or through yourself, saying, look, there were these 11 people, they did the same thing, and they didn't get penalized nearly as severely as Mr. Gomez. Yes, and that was Doran Gomez Rodriguez's testimony at the very end. And am I right in understanding that the report that articulates the 11 individuals is page 80 of the appendix? Exactly, yes. And that was introduced as evidence, that's the June of 2021 report, and it's pretty short, it's only about what they did and what the penalties were. Exactly, yes. And that was the thing that wasn't considered expressly or discussed by anybody? Exactly, yes. Do you happen to have a cite to the testimony of your client at the end where you said the argument was made? Yes, it is. 495. Can I ask you a question while you're looking? So my question while you're looking is, the government's argument was a bit confusing and difficult to follow, but they may have an argument that because this report was generated after the removal action took place, but before the ALJ made its decision, perhaps it shouldn't be considered. But if we vacated the remanded, that could be flushed out on remand. Is that correct? Yes, that's correct. Well, do you think as a matter of law, it has to be considered? I mean, we have to stop the clock running someday. You can't reopen a case two years later because you find out that somebody was discriminating. In this case, they're very much tied because the report was actually done, and to clarify, the report was actually done November 16, 2020. The actual, those are the data. Now, the actual clarification of what is official use and official policy and going through and analyzing the data, that was done on May 16. And then... May 16 of 2021. Of May 16, after the removal. That's when... Okay, so the deciding official would not, at the time he made his decision, have had the relevant information or the arguments you made with respect to... Exactly, but they had the raw data. So what is your view of the law is that when this happens, I think the chief may be correct or is correct that the deciding official doesn't have to look at stuff afterwards. You can't keep reopening the record. So why is it not as a matter of law, he was only compelled, required to look at what was in existence at the time of the decision, and this postdated the decision, end of story? Well, it's not in my brief, but there is case law that goes to, and it's an Air Force case, I believe, where the AJA made a decision and then the comparators were not punished until later. And it came up on appeal in which the court said, even though the later punishment, it happened after the hearing, what happens is that still the decision of that supervisory chain of how they punish individuals for that particular infraction. And so an agency cannot escape its responsibility. Wait, you're saying there's a case by us? I believe it's an MSPB case, Air Force case. A case by the MSPB that says even if the information... Yeah, I can find and provide that site. Okay. I just want to make sure I understand your position. You are not arguing that Officer Hardin, the deciding official, had an obligation to consider the comparators, which only became known after his decision, correct? You're not making that argument. I'm making the argument that it is that... And it's kind of double-minded, so just let me explain. The answer is yes, but... Yes, you are making the argument? No, but yes, I am. Is that he had an obligation to... This is the reason why we mentioned in the hearing that the lieutenant colonel actually disapproved of the actual removal because there was a three-year audit coming. That's our argument. And so... Let me ask a clarifying question. I understood your argument to be that the agency possessed all the necessary information to present to the deciding official on November 16th, which is prior to him rendering his decision. And so if the agency had within its possession, in fact, Chief Deputy Russ, within its possession, all this information of comparators, yes, they didn't issue their report until after the removal decision, but it's the agency's obligation to provide this evidence. How would the individual have the burden of knowing how the agency treated other people? Individuals don't always have access to that. So it is your argument that the agency had the information, it was known in the agency, and it just wasn't shared with the deciding official. But that means he should have been convicted. That is correct. But could I ask you, is there a difference in the information that we're talking about, the November information versus the May information? No. So May information... And does that information include not just what they were found to have done, but also what action was taken against them? They just recommended a May report just as far as to send down to administrative action. They don't say what action was taken as to... Wait, I'm talking about the November. The November? No, it does not state what action was taken. Okay. So how was that, I mean, how did the deciding official have any... That comparator information, by definition, means similar conduct and different action was taken against them. If by November, no decision had been made about what action should be taken against them, what basis was there for a comparator analysis by the deciding official? To that question is that it would have gave the deciding official a full array, like you said, a different analysis of what different people did and as far as what the policy would be. And if nobody was punished, because remember... But nobody would have been punished by that, right? I thought that's what you were telling me. At the time, Officer Gomez Rodriguez had already been proposed to remove. So what was in front of him was the removal of Officer Gomez Rodriguez. I know, but what we're talking about is what was in front of him with regard to the so-called reasonable comparators. And as of November, there was some audit that said they... We find they did X, Y, and Z, but no information as to what... And it was a different deciding official, it wasn't... But no information or no action had been taken against them. So when was... I mean, for reasonable comparators, you just need both pieces. So they informed that second piece was not available as of November. Was it... You can answer. And was it available as of May? When do we know? When did somebody know? It was available as of May. But not as of November. Not as of November. So as far as what... Deciding official was saying, are there reasonable comparators? Because I've got to do this Douglas analysis. And the answer is there were no reasonable comparators at the time, because... Now you're saying, well, if it had been me, I might have decided, well, I should therefore wait. But I don't know that that's the law. So there were no reasonable comparators at the time the deciding official made his decision. But you're saying before the AJ... I assume the AJ... Yes, before the AJ ruled... So if your position is a legal matter, then when information becomes... When something is done after the deciding official makes his decision, he has to reopen his decision to say, okay, well, six months later, I understand there's a comparator out there and somebody disciplined him or whatever. I have to reopen the whole decision to deal with that? Well, I wouldn't say the deciding official, because it's at a different form. It comes into... And it becomes a matter of due process. And to answer that, the question is, is that our answer to that is yes. And the reason being is that the due process is that if you find other information that will help you decide a reasonable penalty, and you find out now they actually have been punished. So what was my obligation as far as inconsistency of the penalty as housing given amongst the division? Then yes, as far as for good order of the actual division to keep it within the realms of... What are the legal parameters that you would set for your rule of law? If something occurs, if information becomes available before the AJ rules and it's submitted into the record, then somebody's got to deal with it and do something about it. Is that the time frame you would propose? Well, I'll go to Loudermilk and part of the opinion in Loudermilk is that the purpose of having these hearings is for the deciding official to gather all the information. We certainly wouldn't want to rush this. We had no complaints that it came out in May. But all we wanted is to have a fair determination of what the penalty would be if that would be the parameters to say, yes, we would like to have that within this period of time, particularly before the hearing. And particularly if we had to file a motion to compel to get the information, it looks like they already had the information. Thank you. If the chief will permit, I have just a few questions I think you can answer quickly, maybe even yes, no. On motion to compel on all those, we got it at the last minute. Again, we don't have any issue on appeal in front of us, correct? All right. On the question of whether the deciding official needed to have the comparators in front of him, I think you're telling me that you are raising that issue on appeal that the comparators had to be in front of the deciding official. Is that an issue you think he put in front of us? In a way, yes. And is it anywhere in your brief? As far as to the brief, we raised it as far as in the context of how it was presented, but not in a direct issue, no. So it's not in your brief, right? No, to answer your question, no, not in the brief. What's in your brief, I think, is that the board failed to, at least you would say, consider the comparators in connection with the Douglas analysis. Is that right? Yes. And am I right that to the extent that's in your brief, it's two sentences at pages 14 and 15 with no citations to the record, no citations to authority of this court. Is that right? Yes. And to answer your question on the testimony of Gomez Rodriguez, I believe his testimony starts at appendix 480. And I can double check that for... Appendix 480. Thank you. In the testimony. And I'll double check that. That's correct. Thank you. Okay. I thank both counsel. This case is taken under submission.